Mosely v. Tuthill et al.

---

## MOSELY vs. TUTHILL ET AL.

[BILL IN CHANCERY TO VACATE SALE OF LAND MADE BY ADMINISTRATOR IN 1863.]

1. *Chancery courts, jurisdiction of.*—In this State, the courts of chancery have jurisdiction to re-examine, and to correct or vacate, sales made during the late rebellion, of the lands of decedents under orders and decrees of the so-called courts of probate of the insurgent authorities, during the supremacy of said rebellion.

2. *Probate courts; orders and decrees of, during the rebellion, how treated.* Such orders and decrees of said so-called courts of probate are to be treated as the orders and decrees of foreign courts; and they may be impeached for fraud, want of jurisdiction, or an illegal exercise of

the jurisdiction which they have usurped. *Quere*—Is there any appeal to this court from the judgment and decrees of said so-called courts of probate, rendered during the late rebellion? (WOODBURY, J., *arguendo*, in *Scott v. Jones*, 5 H. 343.)

3. *Same; power of to order sale of testator's lands.*— Where there is a will, there are but two grounds upon which a court of probate can order a sale of the lands of the testator for the payment of debts : "1. When the will gives no power to sell the same *for that purpose*, and the personal estate is insufficient therefor"; "2. When a sale of the lands is more beneficial than a sale of slaves, and is not in conflict with the provisions of the will."—Rev. Code, § 2079.

4. *Petition to sell lands ; what must allege.*—To give the probate court jurisdiction, the petition for the order to sell should allege one or both these grounds, but not parts of each.

5. *Same ; when allegations of conflict with provisions of the will, order of sale void.*—If the ground alleged in the petition is the second named in the statute, and is in conflict with the provisions of the will, the probate court has no authority to order a sale ; and such a sale should be vacated, and if made, should not be confirmed.

6. *Will ; when brought to notice of, and its power over, the court.*—Where the petition alleges that there is a will, this brings the will to the notice of the court ; and the will is a limit upon the jurisdiction of the court, which cannot be disregarded.

7. *Purchaser at sale made by order of probate court, during the rebellion, which has been vacated ; with what charged and credited.*—On vacating such a sale, made under order and decree of the so-called court of probate of the late rebel government of this State, if such sale has been made for Confederate treasury notes of the so-called "Confederate States of America," the purchaser should be charged with the value of the use and occupation of the land during his possession, and allowed credit for the value of Confederate treasury notes at the date of the purchase, if the sale was for cash, and if said notes were of benefit to the testator's estate or his heirs, and for the value of all necessary repairs and improvements by him made on said land.

APPEAL from Chancery Court of Mobile.
Heard before Hon. ADAM C. FELDER.

MICAEL PRIETO died on the 18th of August, 1860, seized of certain land in Mobile, leaving two sons, appellant and Francis D. Mosely, and the following will, which was duly probated :

"In the name of God, Amen, I, Micael Prieto, do make and publish this as my last will and testament :

"Item 1. I request that all my just debts shall be paid by my executor, hereinafter appointed.

"Item 2. I devise all my real and personal property

Mosely v. Tuthill et al.

equally to be divided, share and share alike, between my two sons, Frank D. Mosely and Louis Robert Mosely, and to be held to them and their heirs upon the terms and conditions hereinafter expressed.

" Item 3. I hereby name, constitute and appoint my beloved husband, Francis Mosely, as the sole executor of this my last will and testament, and I desire that no security may be required of him for the faithful performance of his duties as such executor.

" Item 4. It is my desire that my executor, immediately after my decease, shall take the possession of all my real and personal property, and wholly rent and manage the same, and collect the revenue thereof, until my son, Louis Robert, shall arrive at the age of twenty-one years, when all my said property shall be divided equally, share and share alike, between my said sons, Frank D. and Louis Robert.

" Item 5. I desire that as soon as may be done advantageously, my executor shall sell the house and lot situated on the Dog River road, purchased by me of M. Duplat, upon such terms and conditions as he may deem best for my estate, and the proceeds of said sale to be invested to the best advantage and interest of my estate, to be subject to the conditions and charges hereinafter expressed.

" Item 6. I desire that the net revenue of all my said estate, up to the time of the said coming of age of my son Louis Robert, and the division of the same shall be divided equally between my said husband, Francis Mosely, and my two sons, Frank D. and Louis Robert, each of them receiving annually one-third of the same.

" Item 7. I do hereby charge each of the shares of my two sons, of the property they will receive upon the coming of age of the said Louis Robert and the equal division of said property as above provided, and from that time for the term of the natural life of my said husband, Francis Mosely, with the payment to the said Francis Mosely, of one-third of the net revenue of the said shares; it being the true intent and meaning of this, that the said Francis Mosely is to have one-third of the revenue arising from said property for his natural life, and the said prop-

erty is hereby charged with the payment of the same, into whose hands soever the same may come.

"Item 8. I request that my two servants, Margueritte and Babert, in consideration of their faithful services to me, may remain with and take care of my children, and that they may be treated with kindness and consideration, and their wants amply supplied.

"In witness whereof, being too weak in body to sign my name, I have hereunto affixed my mark, this fourteenth day of August, A. D. 1860.

her<br>
MICAEL ⋈ PRIETO.<br>
mark.

Attest: Chas. P. Robinson, Alphonse Hurtel.

The executor of said will, after accepting the office and entering upon its duties, was removed, and Joseph Bariol was appointed administrator of the estate of Micael Prieto, deceased, with the will annexed. Said administrator made the following application, in September, 1862, for sale of lands:

"The petition of Joseph Bariol, administrator with the will annexed of the estate of Micael Prieto, deceased, respectfully shows, that there has not come into his possession any personal property belonging to said estate except slaves, and that there have been presented and made known to him debts in amount to upwards of six thousand dollars; that petitioner has no money in hand to pay the same, or to pay the taxes and other charges upon the property of the estate, and that he believes some portion of the claims to be just, and that the same should be paid. Your petitioner therefore states that the debts can not be paid out of any personal property other than the slaves, and the sale of the land hereinafter mentioned will be more beneficial to the estate than the sale of the slaves, by reason of the fact that the slaves are family servants, and are needed for the use of the family, and because the servants constitute a family which it is not desirable to break up and separate. The real estate will sell for a good price at this time, but brings no sufficient rent to the estate; that said will gives power to sell only one of the pieces of land embraced herein, to-wit: Lot No. 1, as men-

tioned in the exhibit "A," hereto attached ; and that the sale of the other lands embraced in the said exhibit "A," as prayed for, will not be in conflict with the provisions of said will.

"Your petitioner further shows that the heirs of the said deceased are her two children, Frank D. Mosely, of full age, a resident of this county, and Louis Robert Mosely, of the age of eighteen years, a resident of this county, and that Frank Mosely, a resident of this county, of full age, is interested as a legatee under said will.

"Your petitioner therefore prays that the lands set forth in exhibit "A," hereto attached and made part of this petition, may be sold for the purpose of paying debts of said estate, and that proper orders and decrees may be made for that purpose, and that the terms of sale may be for cash, or as your honor may deem just and proper upon the proof to be presented."

Attached to this petition was a full description of the property.

On the 13th of January, 1863, the probate court made an order for the sale of the property, which, after setting out the petition, notice thereof, appointment of guardian *ad litem*, &c., is as follows : "And it having been proven to the satisfaction of the court by disinterested witnesses, whose testimony has been taken by deposition and upon direct and cross-interrogatories as in chancery cases, and which testimony has been filed of record in this proceeding, that the personal property other than slaves is insufficient to pay the debts of said estate; that the sale of lands hereinafter described will be more beneficial to the estate than the sale of slaves, and that it will be to the interest of said estate that the lands described as follows, to-wit : [Here follows particular description of the property]—should be sold for the purpose, of paying the debts of said estate, according to the prayer of said petition ; and it further appearing that a sale of the said lands will not be in conflict with the provisions of the said will: It is therefore ordered, adjudged and decreed that said application be granted ; and said administrator is hereby ordered to sell the above described land, at public outcry, in man-

ner and form as the law directs in such cases, after having first given notice for at least three successive weeks of the time, place and terms of the sale, together with a description of the property, in the Mobile Advertiser and Register, a newspaper published in this county; said sale to be made for cash."

The administrator, on the 20th of February, 1863, made a report of the sale made in pursuance of said order, setting out advertisement and notice according to the order, and a sale, &c., thereunder, and that a part of the property sold at the price of three thousand and fifty dollars, Confederate States currency, which had been paid, and prayed for an order of confirmation of the sale of the part sold, and for an order for the sale of the remainder (which had been postponed for want of bidders,) on the first Monday of March following.

On the 20th of February, 1863, the court confirmed the sale, and ordered a conveyance of the property sold to Rosina Rutherford, the purchaser, and a conveyance was accordingly made, and the court ordered a sale of the remainder, as prayed for.

Bariol, the administrator, died after the sale of the land described as lot number two, which was made by an agent during Bariol's last illness, and Wesley W. McGuire was appointed and qualified as administrator *de bonis non* of the estate of Micael Prieto, deceased, and reported the sale, on the 23d of April, 1863, of the remainder of the real estate, under the previous order of the court; " that at said sale Jean Jacques Forrer became the highest and best bidder for the same, at the price and sum of eight thousand one hundred dollars; that the said lot of land is numbered two in said order and decree of said sale; that said sale was in all respects fairly conducted, and the sum so bid not greatly disproportionate to the true value of said land and premises; that before the payment of the purchase-money, said Bariol was taken sick, and in a few days died; that your petitioner has been appointed to succeed him as such administrator, and that the purchaser of said property has now paid over the purchase-money." Said McGuire prayed for a confirmation of the sale, and for an

order to execute a conveyance to the purchaser.  The court confirmed the sale and ordered conveyance to be made to the purchaser, on the 23d of April, 1863 ; which was accordingly done.

The purchase-money was paid to McGuire, administrator *de bonis non*, by Forrer, in Confederate treasury notes. Forrer sold, in March, 1866, to George A. Tuthill, for eight thousand dollars lawful money of the United States, who, at the time of filing the bill, held by his tenant, Sophia Lewis.  Appellant became of age one the 24th of September, 1864, and in May, 1867, Francis D. Mosely died intestate, leaving appellant his sole heir-at-law.

In 1864, McGuire filed his accounts for final settlement, and the administration was then finally settled, except as to certain suits which were left open, for the purpose of enabling the administrator to prosecute said suits.

On the 9th of September, 1867, appellant filed his bill, making McGuire and the purchasers and sub-purchasers of the property defendants, and praying for a review and revision of the proceedings in the probate court, so far as concerned the order and proceedings and sale of the real estate ; and that he be reinstated to all his. rights under the will, and for an account of the rents and profits of said real estate, or that he be allowed to redeem the same by paying the equivalent for the Confederate treasury notes paid for the purchase thereof, and for general relief.  On the final hearing on the bill, answers, exhibits and proof, the chancellor dismissed the bill.  The appellant now assigns the dismissal of his bill for error.

Smith & Herndon, and Labuzan, for appellant.—The complainant's case is presented in two aspects :

1. That the sale was void for want of jurisdiction in the probate court.  And under this head the propositions are, first, that the asserted court had no existence in law ; and secondly, that if it was a court, its jurisdiction did not attach in this case.

2. That if the court was a valid court, and if its jurisdiction did attach, the sale was was without consideration, and was a fraud on complainant, then an infant ; and a

court of equity will rescind the sale, restore complainant to the possession of his estate, and give him an account of rents and profits.

Let us consider the propositions in the inverse order in which they are stated above :

1. Complainant insists that the payment of the bid in Confederate States treasury notes was a fraud upon him, by which a conveyance was obtained to his estate for that which was of no value ; that the purchaser from Forrer was put upon notice of this fact of payment in such so-called money, because there was then no other currency in which the payment could have been made ; a fact which is asserted in Forrer's answer, and of which the court itself will take notice, as part of the public history of the times.

The case, in this aspect, falls under the head of fraud upon an infant by collusion between the administrator and purchaser, whereby the infant's estate was conveyed, not for a grossly inadequate consideration only, but without any valuable consideration.

Under the interposition of a foreign and hostile authority, the complainant has been deprived of his property for a consideration which was illegal, if not traitorous—Confederate money.

The acts of the court are not final, but only *prima facie.* Its judgments may be overruled.—*Martin v. Hewitt,* July term, 1870.

A court of equity will rescind the sale.—2 Spence's Eq. Jur. 379-386 ; 1 Story's Eq. §§ 246, 395, 396, 400, 439 ; 2 Story's Eq. 694, 695 ; *Kennedy's Heirs v. Kennedy's Ex'rs,* 2 Ala. 492 ; 12 Ala. 734 ; 11 Ala. 295 ; 9 Ala. 704.

2. Did the probate court acquire jurisdiction to sell the land ?

The statute (Code of 1852, § 1754,) under which the jurisdiction of the probate court to sell the lands in question was attempted to be invoked, provides, "That lands may be sold by the executor or administrator with the will annexed, for the payment of debts, first, when the will gives no power to sell the same for that purpose, and the personal estate is insufficient therefor ; second, when a

sale of the land is more beneficial than a sale of slaves, and is not in conflict with the provisions of the will."

The will is a limit upon the jurisdiction of the court. The court can only sell when the law permits the sale. When the law forbids the sale, the court has no jurisdiction to sell.  Jurisdiction is the authority to act.

The petition of the administrator was predicated on the second clause of the statute, and was filed on the 20th of September, 1862, when slavery was a legal institution.

It is settled by often repeated adjudications of this court, that the question whether the court acquired jurisdiction is solved by the allegations of the petition.—*Satcher v. Satcher's Adm'r*, 41 Ala. 39.

It will appear, in the sequel, that the sale was in conflict with the provisions of the will ; and the question arises, whether the will was, in legal effect, a part of the petition. If so, the conclusion of the petitioner that the sale prayed for was not in conflict with the will, amounts to nothing against the fact, shown by the will, that the order asked for was in such conflict.   The court could not give itself jurisdiction, by reciting in its decree that there was no conflict.

The jurisdiction must be invoked by the administrator. The statute so declares ; the court can not act *mero motu*.

The question, then, depends upon whether the will was to be treated as before the court, on the petition as a part, in legal effect, of such petition.

Appellant contends, first, that the petition necessarily brings the will before the court, as part of it ; and secondly, that the petition, in fact, so refers to the will as to make it in effect an exhibit.

The correctness of the first proposition appears by considering the effect of its rejection.

If the jurisdiction is to be settled by the mere words of the petition, excluding the will from consideration, the consequence follows that an administrator may obtain a sale of lands of decedent on an allegation shown to be untrue by the will ; and if the court, on such petition, orders the sale of an infant's land, as in this case, and if the sale takes place when he is not *sui juris*, he may, if he

has taken a bill of exceptions, reverse the case and show what wrong he has suffered, but can never get his estate. Opinion of Walker, C. J., in *Howard v. Howard, Adm'r*, 41 Ala. 602, and authorities there cited; *Pittfield v. Gazzam*, 2 Ala. 325. It is supposed to be undoubted law, that the reversal would not avoid a judicial sale made by a court that had obtained jurisdiction.

If, on the contrary, the will is part of the petition in legal effect, then the owner of the estate is protected from such ruinous wrong, from the unlearned and erroneous construction of the will by the personal representative. But if the will is no part of the petition, it could only, if at all, be considered by being introduced as evidence on the hearing of the petition, and could never be considered by an appellate court, unless the infant had attended the hearing of the petition, and made it part of the record by bill of exception.

The intention of the law is, that the will shall not be violated. The court has no power to violate it. It is the polar star of the whole administration. For its execution the personal representative is appointed. Its provisions come up in, and govern, every act of administration. The statute under which the proceedings in question in this case were had, empowers the executor or administrator to sell the lands of his decedent, not when he will dryly and fictitiously state in a petition that the sale asked for is not in conflict with the provisions of the will, but when in fact there is no such conflict.—Code of 1852, § 1754. But the whole jurisdiction rests on the petition, and the question is, as before said, does the petition necessarily embrace the will? If so, there is a wholesome protection to a minor's estate devised to him; if not, there is little or none against the errors or intentional wrongs of the personal representative.

If it were a proceeding in chancery, the will would be a part of the record. In such case, the court of probate follows chancery precedents.

Here the power is not general, but special. It is not an authority to sell in all cases for a special purpose, but only in a special instance.

An examination of the statute under which the proceedings were had, shows that it does not contemplate the production or consideration of the will in any stages of the case subsequent to the filing of the petition, or in any other way than as part of the petition.

Section 1858 of the Code of 1852 requires the applicant to prove nothing at the hearing, but "that it will be more for the benefit of the estate that the lands should be sold than the slaves"; and the requirements of section 1760 are, that the court shall order the sale, if it is satisfied it will be more for the interest of the estate that lands should be sold than slaves, and if "the application is" "that no power is given by the will for that purpose." The consideration of the question by the court as to whether the sale is to conflict with the provisions of the will, is here entirely omitted, and hence it must appear by the petition, and the question must come up on the petition itself, and it can only so come up by placing the will before the court as an exhibit to, and part of, the petition.

If the will is adverse to the sale, the petition has no more standing than if, in hæc verba, it had said that the will prohibited the thing asked for.

No decision of this court has held that the probate court can acquire jurisdiction to violate a will, because the personal representative may roundly say, in a petition, that what he asks is not in conflict with the provisions of the will. The jurisdiction, in the case presented, rests on the fact that the order asked for does not violate the will.

The language of the court in Mattheson's Heirs v. Hearin, 29 Ala. 219, to the effect that the filing of the petition with the proper allegations gives the jurisdiction, is not in conflict with the foregoing proposition. Neither that, nor the cases therein referred to, involved the question under consideration. Applied to the facts, the conclusion of the court in these cases, is not questioned. There the will was not shown. It was not pretended that the will violated it; but the point was, whether the petition, on its face, was defective for matters not touching the provisions of the will.

An examination of the will shows that it was violated by the sale of the real estate in question.

The testator devoted a particular piece of land to sale, and required the rest of his estate to be held and managed in trust by his executor, and the rents and income to be applied, until the majority of complainant.

During the minority of the complainant, there was a continuing trust, the execution of which was inconsistent with a sale.   On the majority of complainant, he and his brother took the estate as devisees, and could of course dispose of it as owners; and the testator meets this state of things, and secures the bounty she had provided for her husband, by declaring that it shall be a charge on the estate, into whose hands soever it might come.   Until the majority of complainant, the executor had the control as trustee; and it was unnecessary to protect, during such minority, the provision made for him, by charging it specially on the estate, for it could not be sold; but when the estate should come into the hands of the sons, they, as owners, might sell it. On complainant's majority, the power in the executor would cease, and the testator, in view of this, secures the bounty intended for the husband, by then charging it on the estate, into whose hands soever it might come.   The probate court had no jurisdiction of the trusts of this will, and no power to defeat them by sale.— *Gould v. Hayes*, 19 Ala. 449; *Wimberly v. Wimberly*, 38 Ala. 41; 9 Ala. 478; 4 Por. 323; 8 Por. 399; 17 Ala. 215.

Appellee's proposition is, that the probate court could, by an order of sale, defeat the trusts of the will, over which trusts a court of chancery alone has jurisdiction, and defeat the charge on the property made for the husband; for if it could sell the estate, of course it could sell it free from the charge; the estate authorized by the statute to be sold being the estate which the testator had.

It will, however, be said that this argument would only apply to a case of appeal from the decree.   But an appeal from the decree would not right the wrong.   A reversal of the decree of the probate court would not avoid the sale, as has been before shown, and so the argument amounts to this : if the court assumes a jurisdiction and disposes of

Mosely v. Tuthill et al.

an infant's estate, he has no remedy. He may reverse the decree, but he will then only have the empty satisfaction of showing that he has wrongly been divested of his estate under color of law ; but as to his estate, it has gone forever by a judicial sale. Surely, the law must give some redress. Redress is found in that the jurisdiction of the court to entertain the petition must depend on the fact that the will was brought before the court, along with, and as part of, the petition. It is difficult, indeed, to imagine any act of administration in which the will is not necessarily brought before the court; the letters of administration, the very power under which the administrator acts, say that they are letters with the will annexed ; and every time he presents himself before the court, he comes with the will annexed.

In this case, the administrator virtually brings the will up as part of his petition, by alleging that the " will gives power to sell only one of the pieces of land embraced " in his petition. This reference to the positive provisions of the will as directly brings it before the court as if he had added, " as appears by a copy of said will hereto appended and made part of this petition, marked exhibit A."

3. The petition fails to make a case of jurisdiction, even if the will was not brought before the court.

It shows simply that the administrator believes " some (indefinite) portion of the claims presented to be just."

2. He does not give any account or description of these claims.

3. He shows that he has authority by the will to sell one piece of the land embraced in his petition, and does not show that this is insufficient for the payment of the debts.

4. He alleges that there has not come into his possession any personal property, except the slaves; and therefore concludes that the debts can not be paid out of any personal property, other than the slaves ; implying that there was in action personal property, other than the slaves, sufficient for the payment of the debts. He shows that the slaves alone were sufficient, and the further inference is, that the real estate ordered by the will to be sold was alone sufficient for the payment of the debts.

5. The ground for sale of real estate contemplated by the

41

statute is, that it will be more to the pecuniary benefit of the legatees and devisees to sell the land than the slaves; and the petition shows that family convenience and the advantage of the slaves were the grounds of the petition, and not the pecuniary benefit of the estate.

Even if the will was not before the court, each and all of the foregoing matters were involved in the question of sale, and the devisees had a right to contest them.—*Bond's Heirs v. Smith's Adm'r*, 2 Ala. 660. It was, therefore, necessary that they should have been set forth with such particularity as to admit of an issue and contest, and failing to be so set forth, the petitioner fails to show a case for the jurisdiction of the court. Indeed, the petition shows that there was no necessity to sell any property, and fails to show that the pecuniary interest of the estate required a sale of land instead of slaves.

4. The will has, as shown, been violated by the order of sale. The pretended sale was never, in legal effect, made. McGuire, the successor of Bariol, had no power to give validity to the pretended sale; and complainant is entitled to relief in a court of equity, even if the jurisdiction of the probate court to order the sale attached; and relief can only be had in a court of equity.

At the time the petition was filed, and at the time of the decree and sale, slaves were personal property. Personal property is the primary fund for the payment of debts of decedents. Real estate could only be sold to pay debts of a testator, when such sale would not be in any manner in conflict with the provisions of the will. If there is a conflict between the will and the order asked, the order could not have properly been given, and it is immaterial in what the conflict consists. It is not necessary that the will be violated in the selection of real estate in preference to slaves for sale. If the will forbids any sale of the property of decedent, or creates trusts that would be violated by any sale of property, and there is a necessity to sell for the payment of debts, the personalty is the primary fund for such payment, and the real estate can not be sold until the personalty is exhausted. A simple perusal of the will establishes the proposition that it was violated by the sale.

A reference is made, on this point, to the preceding division of this brief. The will is incapable of execution since the sale; hence, it has been clearly violated, and violated without any necessity for selling the real estate in question.

The pretended sale of Bariol had no existence. He not only was not present, but was on his death bed.—*Ellis v. Molloy*, 2 Hob. 225; 3 Chit. Eq. Dig. p. 2510, § 18.

There was no memorandum of sale within the statute of frauds, for there was no one to make it.—*Hutton v. Williams*, 35 Ala. 503.

McGuire's administration had no connection with Bariol's. The sale, if made by Bariol, could not be reported by McGuire, for the report required personal information and judgment, which McGuire, a stranger, could not have had.—*Lambeth v. Garber*, 6 Ala. 870.

The authority conferred by the decree of the court upon the administrator, to sell, was a personal trust, and could be executed by none but himself. There is a discretion vested in him; the power is to him alone. He may withdraw the property from sale; he may in his discretion postpone the sale. It is left with him to determine whether or not the sale was fairly conducted, whether a proper number of bidders were present, whether the property was properly and for a sufficient length of time cried; and upon his report the court greatly relies in its confirmation or nonconfirmation of the sale. Being a personal trust, as before remarked, none other than himself can execute it. The evidence conclusively shows that the administrator was not present at, and did not conduct, the sale.— *Wyman v. Campbell*, 6 Port. 245. And the ratification of Bariol's postponement of sale to the first Monday in March was equivalent to an order to sell on the first Monday.—6 Port. 244, 245.

The postponement of sale by Bariol was to the first Monday in March. He so returned, and the court expressly confirmed the postponement to the first Monday in March. Yet the return of McGuire is, that it was made on the second Monday in March (Bond's dep. 1867; Brooks' dep. 1865); thus illustrating that Bariol's successor did not possess the knowledge requisite to a proper representation of Bariol's acts.

The court that ordered the sale had no legal existence, and its decree and the sale under it were void.—*Ex-parte Bibb*, January term, 1870.

It has been before shown, that the only remedy is by bill in equity. The sale is a cloud on the title, and by it an infant has been and is dispossessed of his estate; and he is entitled to have the sale, if void, so declared; if valid in a court of law, to have it set aside in equity, and to be restored to his estate, with an account of rents and profits.

The statute (Code of 1867, §§ 2274, 2275,) has no effect on this case. The bill is not filed to correct a settlement of the estate of a decedent. The statute has no relation to a bill to set aside a sale, or to remove a cloud on titles.

This was a decree of the Confederate States government of Alabama. It was the judgment of a foreign court; it is not conclusive. If it casts a shadow on the title of the complainant, it may be inquired into.—*Martin v. Hewitt*, January term, 1870.

The jurisdiction in equity grew out of the injustice done by a too strict adherence to the enforcement of the law. It was introduced to modify this injustice.

Here the facts show that wrong has been done the complainant, not by an error in the administration of the law, but by an improper assumption of jurisdiction.

The will is the law of the administration of the estate. This the court must enforce. The court can not disregard the will, and proceed as if there was no will. This is an authority not conferred upon the court. The court may err not only in executing its jurisdiction, but it may err in assuming jurisdiction. Where there is no authority to do the thing done, there is no jurisdiction?

P. HAMILTON, *contra*.—It is submitted that the conclusive answer to the whole bill is, that if the court of probate had no jurisdiction to order the sale in the first place, or if it had no jurisdiction in the second place to confirm the sale, on account of any or all the alleged irregularities, or on account of the receipt of Confederate money as an illegal, unlawful currency, and which could give rise to no legal rights which could be ratified, or approved or confirmed;

or if, in the third place, the court of probate, as then existing and acting in the case, was no court, and could exercise no authority in the premises; then, in each and all of these cases, the consequence inevitably follows : the plaintiff had not been divested of his title, and there is no occasion for him to come into a court of equity for any purpose. His remedy upon either of these theories is plain and adequate at law, and he can have no standing in this court.

The matter at issue is of common-law cognizance—that is, title to land; and a court of equity never undertakes to deal with it in the first instance, and until the title has been passed upon by a jury; for that is the common-law right of every citizen.—6 Ala. 450 ; 2 Ala. 625 ; 12 Ala. 687. This is one of the main tests to be applied to the jurisdiction of this court. On theory, it was organized to remedy the deficiencies and hardships of the common law, and by consequence, if that system furnished a suitor an adequate remedy, equity could not interpose.

It is difficult to see how a case of plainer legal remedy could be found, than on the case presented by this appellant.

A further answer to the case of the bill is found in the principle, that no judgment of any tribunal can be collaterally impeached.

The principle was decided in 6 Port. 219, overruling 2 Stew. 331, and S. & P. 355, that, in the exercise of its authority to authorize the sale of land by an executor or administrator, the court of probate exercised jurisdiction as distinguished from a mere power; and that in such case its judgment remained good until reversed, no matter how full of reversible errors its proceedings might be.

This rule has never been departed from in this court. 6 Port. 249, 262 ; 1 Ala. 475, 730 ; 10 Ala. 172, 652 ; 6 Ala. 412 ; 7 Ala. 855 ; 17 Ala. 714 ; 28 Ala. 164 ; 29 Ala. 210 ; 41 Ala. 26 ; 42 Ala. 452.

The principle of these cases is, that the jurisdiction of the court is called into exercise upon the filing of a petition by the personal representative of a deceased for a sale, setting forth a statutory ground—that the proceeding is *in*

*rem*—and thereupon the jurisdiction attaches, and a sale so authorized passes the title to the purchaser, though the record of the proceedings may abound in reversible errors.

The simple question then, is, did the jurisdiction attach ? Does the petition show such cause as authorized the court to act ?

The decedent died intestate. Her will did not authorize the sale of this lot of land, but it did authorize the sale of another lot.

The application for leave to sell was made on the 20th of September, 1862. The order of the probate court authorizing the sale was made on the 13th of January, 1863. The sale was made on the 9th of March, 1863. The order of court confirming the sale, and directing a deed to the purchaser, was made on the 23d of April, 1863.

The law under which the proceeding was had was the law in force on the 20th of September, 1862, and is to be found in the Code of 1852 as modified by the act of the 7th of February, 1854.—Rev. Code, §§ 1754–60, 1762–65, 1769, 1770, 1867, 1868 ; Pamph. Acts 1853–54, p. 55 ; Rev. Code, §§ 1868 -72.

The application for the sale of this lot was made by the administrator with the will annexed. It described with particularity this lot, together with another, both in a schedule attached to the petition ; it gave the name of the heirs, to-wit : Frank D. and Lewis R. Mosely, who were also devisees, and also of the father Francis, who was a devisee under the will of Micael Prieto ; gave their place of residence, and stated that one, Louis R. Mosely, was a minor.

The petition stated that the estate was in debt ; that there were no means in hand to pay the same, and said debt could only be paid by a sale of the land of the estate, or of the slaves, and that it would be more beneficial to the estate to sell the land than the slaves ; that there was no power by the will to sell this lot of land, but that its sale would not be in conflict with the provisions of the will, and prays that this and the other described lot of land might be sold for the payment of debts. It was made on oath.

It is then ordered that the application be granted, and

the administrator is ordered to sell the land at public out-
cry, as required by law, after giving, by advertisement in
the "Advertiser and Register" for at least three success-
ive weeks, notice of the time, place, and terms of sale; the
sale to be for cash.

On the 20th of February, 1863, Bariol reported to the
court that he had sold the piece of land which had been
directed by the will to be sold; the other lot had not been
sold for want of bidders, and the sale had been postponed
to the first Monday in March.

The court received this report, approved and confirmed
the sale, and directed a deed to the purchaser, and ordered
the report to be recorded.

On the 23d of April, 1863, McGuire, administrator *de
bonis non*, by petition made known to the court that Bariol,
former administrator with the will annexed, had applied
for and obtained an order for the sale of the lot of land in
question; that said Bariol had advertised the land for sale
in the "Advertiser and Register" newspaper, for more than
thirty days, and on the second Monday of March, 1863, had
sold the lot at public auction before the court house between
the hours of 12 m. and 5 p. m.; that Jacques Forrer had
been the best bidder therefor, at the price of eight thou-
sand one hundred dollars; that said sale had been fairly
conducted; that the sum so bid is not greatly dispropor-
tionate to the value of the property; that before payment
of the purchase-money, Bariol had sickened and died; that
the purchaser had paid the money to him as his successor;
prays the sale may be confirmed, and title authorized to be
made.

Upon this petition, the court finds the facts therein stated
to be true, makes its order confirming said sale, and direct-
ed said administrator to make to the purchaser a convey-
ance of all the right, title and interest which the decedent
had to the said lot of land at the time of her death.

The authority for this proceeding is found in section
1754 of the Revised Code: an executor or administrator
with the will annexed, is authorized to seek a sale for pay-
ment of debts, first, when the will gives no power, and the
personal estate is insufficient; second, when a sale of the

land would be more beneficial to the estate than a sale of slaves.—Rev. Code, § 1756.

The application must be by executor or administrator with the will annexed, and verified by oath.

By act of 1854, the petition must conform to section 1868, and must describe the lands, the names and residence of heirs or devisees, and state which are infants, of unsound mind, and married women.

The proceedings after the petition are pointed out in section 1757, as modified by act of 1854—a day not less than forty days distant must be appointed for the hearing—a guardian *ad litem* must be appointed for the infant, citatations must issue to the heirs or devisees of full age residing in the State, and served ten days before the hearing. (No unsound minds or married women are concerned with this case, and no non-residents.)

Notice of the application must be given by advertisement for three weeks in a newspaper published in the county, or by posted notice, at the discretion of the judge. Act 1854.

The proofs must be made by deposition, as in chancery cases, and filed of record.—Act 1854.

On such proof being made, court may order the sale, on such terms as court may direct, not to exceed a credit of twelve months, with two approved securities.—Act 1854.

The sale must be advertised, conducted, reported, and confirmed, as provided in Code, §§ 1762, 1764, 1765, 1769, 1770; that is to say, the sale must be advertised by the executor or administrator in some newspaper in the county for three successive weeks.

The executor or administrator must, within sixty days, make report of the sale to the court, on oath, who must examine the same, and when satisfied that the sale is fairly conducted, and the land sold for an amount not greatly disproportionate to its real value, and the money properly secured, must confirm the sale; and on proof of payment of the purchase-money, must direct a deed to be made to the purchaser.

The record of the probate court thus shews a very accurate adherence to the provisions of the statute, and far

Mosely v. Tuthill et al. ˙

more close than is requisite to maintain the title of the purchaser in a collateral proceeding.

The jurisdiction became active upon the filing of this petition.—1 Ala. 475; 10 Ala. 652; 41 Ala. 26; 42 Ala. 452. And it was perfected when the decree of approval and confirmation was made.—28 Ala. 164.

In fact, upon the admission of the bill, the jurisdiction was in full exercise. Its language is, "and thereupon (after the filing) the necessary proceedings were had in order to effect a sale, except" some irregularities, which the bill undertakes to specify, but all of which occurred after the petition; that is, after jurisdiction had attached, and before confirmation, and which were cured by the action of the court in confirming its own proceedings and directing the deed to the purchaser.—1 Ala. 475; 9 Ala. 297; 19 Ala. 367.

The authorities heretofore cited shew that none of these intervening objections, even if good upon direct appeal, have sufficient force to vacate the sale when collaterally impeached.

A species of hypercriticism is used to attack the allegations of the petition, because the language there used does not exclude all conclusion that, by possibility, something not denied yet existed in the cause. No answer to such criticism is required, because the admissions of the bill confess the jurisdiction by filing a proper petition; and because no law requires such acute use of language in such applications. The question is, does it sufficiently appear upon the face of the petition that the case required by the statute was presented to the court?

In this case, it should appear that the will gave no power to sell this land; that appears in the petition; that a sale of the land will be more beneficial than a sale of the slaves, which is specifically alleged in the petition, and also that there are no other means to pay debts other than the lands and the slaves. It should also appear that the sale of the land prayed for is not in conflict with the provisions of the will; these statements are distinctly made. So, then, the facts necessary to give the court jurisdiction of the case all very distinctly appear on the face of the petition; and if the

validity of former decisions is to be maintained, (and having now for many years become a law of property in the State, they will not be departed from,) the title of these defendants will not be disturbed.

An objection is made, in this court, to the truthfulness of the petition, as to the allegation that the sale of this lot of land would not be in conflict with the provisions of the will ; and it is sought to be maintained that there is conflict between the petition and will ; therefore, the court had no jurisdiction to order the sale.

It is a sufficient answer to say that the bill sets up no such cause of objection.

A further answer is to be found in the fact, that the will is not part of the petition to the court below, and is therefore not before this court for examination in that connection.    Another answer is found in the fact, that it was for the court below to pass upon, as a part of the case before it ; and this proceeding is not by way of appeal or review of that proceeding, but is an application to another forum, that has no appellate jurisdiction but by way of a collateral attack.    In such case, all intendments will be made to support the judgment.

If this proceeding succeed, it must be not by the establishment of error merely, but by establishing the legal position, that the probate court had no jurisdiction at all in the case.

But even if the will were before the court in connection with the petition, we contend the objection does not exist, even as an error.

There is legally no conflict between the will and the petition.    It is true, the will directs the sale of one piece of land, it is silent as to the sale of the other ; it did not forbid its sale.    It could not have done that, because the law (Code, § 1737,) charges all the property with payment of the debts of the decedent, and directs its sale, if necessary.    The silence of the will as to this does not and could not amount to a prohibition of sale.    If the necessity existed of a sale of property to pay debts, and there existed only lands and slaves to be sold, and the choice had to be made between them, the question of a con-

flict with the will must be determined by seeing if the will directed that the one or the other should in preference be retained. Now, in this case, the will did, in effect, express a preference for the sale of the land, for there is an express direction made that the slaves should be retained with the family of the testator; so that, in fact, if the question were open for examination, the sale of the land was not in conflict with the will.

To hold the sale void in this case, the court must hold for nothing the acts of the court preceding and authorizing the sale, and the actual sale and confirmation, simply because the preceding administrator died without completing what the court had approved and authorized.

But before this time, by the lawful act of the then administrator, a third party, by purchase, had acquired an interest in and to the land. It remained to the devisees or heirs, subject to that charge; and though, in general, the two administrations are distinct, the second must of necessity take the assets subject to the acts of the first.—28 Miss. 187; 19 Ga. 153; 13 Ga. 1; 1 Conn. 467.

The whole case rests upon the fact of jurisdiction existing and exercised.

It is submitted that the preceding observations are conclusive upon the case, unless it be held that the probate court, as existing in 1862–63, was no court.

Undoubtedly the courts of the Confederate State government of Alabama, during the late rebellion against the government of the United States, were not those of a legal government. That there was a government, is not denied; but it was a government of usurpation, a government hostile to the constitution of the United States. In *Texas v. White*, it was settled that the illegal government of Texas had no authority to repeal the law of the legal government of the same State, because the illegal government was erected in hostility to the constitution of the United States. It was destitute of authority to make legal laws; not that the repealing law itself was unconstitutional, but it was the law of an unconstitutional government, and therefore void. This is the argument of the Chief Justice; this is the judgment of the court, and this was the vital point in the case.

There was no other law in controversy before the court, save the repealing law of the insurgent government; and its invalidity grew out of the invalidity of the government that had enacted it. This is as far as that case is entitled to be regarded as a legitimate authority.

That doctrine has not yet been announced by this or any court. It would work a revolution in these States, not less extensive and severe than was attempted by the agency of war.

It is to be observed that no fact of support to the rebellion is involved in this case—no act of hostility to the United States. The question is of private right, and relates to private property; and whether the title of the one party or the other is the better, is of no consequence to the government of the United States, and will call in question no one of its powers. It relates to private rights as enforced by laws operating between citizens of Alabama.

The use of Confederate money in such case was not of a treasonable character. Its original issue proceeded from a treasonable intent, but its use was a matter of necessity, and the receipt and employment of it had no treasonable character attached to it.—8 Wall. 1.

The receipt of the money by the administrator in this case was not forced upon him by any legislation of the State, passed with a view to aid the insurgent government. So the case is not to be determined on the principles announced by this court in the case of *Hall v. Hall et al.*, when the defense made was an investment in Confederate bonds, under laws of the State authorizing, if not directing, such investment.

If the court decide adversely to this title, it will be on the proposition that during the late rebellion there were no courts in Alabama. This would be the assertion of the existence of anarchy, an assertion contrary to the known fact.

There were laws in Alabama, and there was a government in Alabama. It is against the theory now adopted to assert that such laws and such government were *de jure*. It is not against such theory to assert that they were *de facto*. For this argument, the proposition is limited to the

government and laws of the State, and no reference is made to any general authority exercised over the Southern States combined by the so-called Confederate government.

The assertion of a *de facto* government in Alabama is consistent with all the tests which can be applied to the question. The new government did exercise power it did pass laws; it did enforce those laws; and it did possess itself of the accustomed seat of the former rightful government. All its acts proceeded from the seat of government of the State, and it possessed all the governmental offices and machinery located there, and which the former goverment had been accustomed to use. Apart from its acts in direct hostility to the government of the United States, the proceedings of such a government are valid and binding, and particularly over its own citizens.—*The State of Texas v. White*, 7 Wall. 732, 733.

Chief Justice Chase remarks of such government, that its " acts necessary to peace and good order, such as acts sanctioning and protecting marriage and the domestic relations, governing the course of descents, regulating the conveyance and transfer of property, real and personal, and providing remedies for injuries to person and estate, and other similar acts, which would be valid if emanating from a lawful government, must be regarded in general as valid when proceeding from an actual though unlawful government."

Similar principles, though not precisely the same, are asserted by the same court, through its Chief Justice, in the case of *Thorington v. Smith*, 8 Wall. 6. The propositions are not precisely the same as those in *Texas v. White*, but only because in the latter case the status of the Confederate government was considered, while in the former case it was the status of a State government. The different grades of governments *de facto* are mentioned. A perfect *de facto* government is declared to be one which, without rightful authority, but in truth, obtains the supreme control of the country, and expels the regular authorities from their accustomed seats and functions, and so becomes the actual government of the country.

It was in this particular that the Confederate government failed to become a government *de facto* of the perfect

type; but in this very particular, the government of the State of Alabama did succeed, and did exercise from those seats of ancient and regular authority the whole political power of the State.

That high court, notwithstanding the failure of the Confederate government in this respect, concedes to it the status of a government within the territorial limits it occupied, and concedes to it, as a matter of duty as well as of necessity, the obedience of the citizen to its authority in civil and local affairs.

That high court, in like manner, recognizes the existence of the Confederate currency as something more than waste paper; as, in fact, a currency which had a value, which existed by virtue of a power exercising political authority, and which formed the basis of contracts, and that these contracts the courts of the present government will enforce.

Upon these authorities, then, the fact of an existing government, with laws and officers and courts, can not be disputed; and their acts and doings, in matters not directly opposing the claim and rights of the United States, are valid and binding as between citizens of the State, and will be enforced by courts of the rightful power, as the acts of *de facto* courts and officers.

The defendant, Tuthill, is a purchaser of this property, for value, and without notice of the claim of this complainant.

He holds under a purchase for value paid at a judicial sale. Such purchaser is only chargeable with the duty to see that the case was within the jurisdiction of the court; that the court took jurisdiction, made an order of sale, and that the act of its agent, the administrator, was approved.

PETERS, J.—The question of importance in this cause is, what force shall be given to the order of sale made by the so-called "probate court," sitting in the county of Mobile, in this State, on the thirteenth day of January, in the year 1863, under authority of which the sale of the lands now sought to be set aside, was made? Has that order any validity? and to what extent is it to be treated as a sufficient authority?

Undoubtedly, the court that made the order for this sale was not a court of a State of the Union. At the time this order was applied for, at the time it was made, and at the date of the sale and its confirmation, the State of Alabama was under the control of the insurrectionary government which had been organized after the passage of the ordinance of secession. Speaking of just such a government, Chief Justice Chase declares that its legislative department was illegal. He says : " In this case, however, it is .said that the restriction imposed by the act of 1851 (the law of the legal government,) was repealed by the act of 1862, (the law of the illegal government.) And this is true, if the act of 1862 can be regarded as valid. But was it valid ? The legislature of Texas, at the time of the repeal, constituted one of the departments of a State government established in hostility to the constitution of the United States. It can not be regarded, therefore, in the courts of the United States, as a lawful legislature, or its acts as lawful acts."— *Texas v. White*, 7 Wall. 732, 700. The courts of these insurgent governments were also departments of the same organizations.—Const. of Secession Gov. of Ala. of 1861, Art. III, sec. 1. Then, what vitiated the acts of the one branch of the government, would also render void the acts of the other departments of the same. *Ubi eadem ratio ibi idem lex.*—7 Coke, 18 ; Broom's Max. But this principle, that an unauthorized government organized within a State or a territory of the Union was illegal, was not new with the Chief Justice, who delivered the opinion of the court in the case of *Texas v. White*, above quoted. The same doctrine had been distinctly announced by Justice Woodbury, in 1846, in the case of *Scott v. Jones.* Speaking of the unauthorized government which had been erected in the Territory of Michigan, before the admission of that State into the Union by Congress, he says : " Again : such conduct by bodies situated within our limits, unless by States duly admitted into the Union, would have to be reached either by the power of the Union to put down insurrections, or by the ordinary penal laws of the States or territories within which these bodies unlawfully organized are situated and acting.

While in that condition, their measures are not examinable at all by a writ of error to this court, *as not being statutes by a State or a member of the Union.*"—*Scott v. Jones,* 5 How. 378, 343. In this opinion, the distinguished Justice alludes to the legislative acts of such unlawful organizations "within our limits" as mere "*measures,*" which were entitled to no standing or notice in the courts of the United States, for the very significant reason that they were not "statutes" of "a State or a member of the Union." These declarations show that a government erected in a State of the Union, which is in hostility to the constitution and laws of the nation, is illegal, not only in *one,* but in *all* its departments. In the case of *Luther v. Borden,* Chief Justice Taney very emphatically and distinctly proclaims what force is due to the acts of a government erected in a State, which had "no legal existence;" that is, a government erected contrary to law, or "in hostility to the constitution of the United States," which is "the supreme law of the land." He says: "For, if this court is authorized to enter upon this inquiry as proposed by the plaintiff, and it should be decided that the charter government had no legal existence during the period of time above mentioned, if it had been annulled by the adoption of the opposing government, then, *the laws passed by its legislature during that time were nullities; its taxes wrongfully collected; its salaries and compensation to its officers illegally paid; its public accounts improperly settled; and the judgments and sentences of its courts in civil and criminal cases null and void, and the officers who carried their decisions into operation answerable as trespassers, if not in some cases as criminals.*"—*Luther v. Borden,* 7 How. 38, 39, 1. No stronger expression can be anywhere found of the *utter nullity* of *all the acts* of an illegal government within a State of the Union, than in this of the late Chief Justice of the highest court of the nation. This opinion has never been seriously doubted or denied, but it has been constantly affirmed by every branch of the national government since it was made public. Again, in *Mauran v. Insurance Company,* Justice Nelson, speaking for the court, says: "*We agree,* that *all* the proceedings of the eleven

States, either severally or in conjunction, by means of which the existing governments were overthrown, and new governments erected in their stead, were *wholly illegal* and *void*, and that they remained after the attempted separation and change of government, in judgment of law, as completely under all their constitutional obligations as before."—*Mauran v. Insurance Company*, 6 Wall. 13, 14, 1. In *Chisholm v. Coleman*, this court, anticipating the decision in *Texas v. White, supra*, has decided that the rebel government in this State during the late war was illegal, and that the judges of its circuit courts were not the judges of the rightful legal government.—43 Ala. 204. Governed by the principles announced in the above cited cases, my own conclusions force me to pronounce the decree of the so-called " probate court " of the county of Mobile, in this State, under authority of which the lands belonging to Micael Prieto were sold, to be wholly void, as the decree of a court of an illegal government. But this question has been so far determined in this State as to give said decree the force of a foreign judgment, if it should appear that the tribunal by which it was rendered had jurisdiction to render any decree in the premises. Such is the decision in the case of *Martin v. Hewitt*, June T. 1870. The people alone have the power to make governments in this country, and to unmake and to change them ; but even in this they have bound themselves to act in conformity to the constitution and laws of the nation. When they do not act under this authority, but in hostility to it, their acts are illegal and insurrectionary, and when the insurrection is put down by the supreme authority of the nation, such illegal governments and their acts can have only such recognition in our courts as the political authority of the State or nation chooses to give them. They must either have legal sanction to begin with, or legal sanction in the end, to cure their irregularities and unlawful inception. The doctrine of governments *de facto* can have no place in the political system of the United States, because here the courts can only know the government of a people acting harmoniously with the nation, and which has been erected in conformity with law, or which has been acknowledged

42

and acquiesced in by the legitimate political power, whether State or national. The existence of a government, and its boundaries, is a political question, and the courts can not settle this, or questions arising under it, until it is first settled by the rightful, or at least the successful political authority.—*Cherokee Nation v. Georgia,* 5 Pet. 20; *Rhode Island v. Massachusetts,* 12 Pet. 736, 738 ; *Santissima Trinidad,* 7 Wheat. 336, 337 ; *City of Berne v. The Bank of England,* 9 Ves. 347. The Confederate government in the State of Alabama, during the rebellion, was an illegal government, criminal and void. It has never been acknowledged by the rightful political power as a government *de facto,* or in any legal sense as an authority capable of enacting valid laws by its legislative department, or of rendering valid judgments by its courts.—See *Ex parte Bibb,* Jan. T. 1870; *Noble & Bro. v. Smith Cullom & Co.,* June T. 1870 ; *Ray v. Thompson,* Jan. T. 1870.

But the decision in *Martin v. Hewitt, supra,* has to a certain extent closed the discussion in this court upon the invalidity of the judgments and decrees of the courts of the Confederate government rendered in this State during the rebellion. They are to have some force, but not greater than that of the judgments of foreign courts. Judge Story lays it down as the result of his inquiries, that " the general doctrine maintained in the American courts in relation to foreign judgments certainly is, that they are *prima facie* evidence; *but they are impeachable.* But how far, and to what extent this doctrine is to be carried, does not seem to be definitely settled. It has been declared, that the jurisdiction of the court, and its power over the parties and the things in controversy, may be inquired into ; and that the judgment may be impeached for fraud. Beyond this, no definite lines have as yet been drawn."—Confl. of Laws, § 608, pp. 1003, 1004; see, also, 2 Kent, 120, marg. This seems also to be law in this State, so far as it has been indicated by the sovereign will. Ordin. No. 40, Conv. of 1867 ; Pamph. Acts 1868, pp. 187, 188. From such a decree, necessarily there is no appeal or writ of error to the courts of the rightful government. *Scott v. Jones, supra.* Then the only method of correcting

Mosely v. Tuthill et al.

its departures from law, must be a rehearing of the questions upon which its "considerations" rest. This, possibly, might be done in the court of probate where the original record in the cause remains, if the judgment has not been carried into effect, or has not been executed and satisfied.—Ordinance No. 40, Convention of 1867; Pamph. Acts 1868, pp. 187, 188. If this ordinance may be claimed to give the proceedings in the rebel courts of probate some recognition, and consequently some validity, it at the same time prescribes a method for their re-examination and the correction of their errors. This was necessary. And it harmonizes with the principle upon which the decision of the case of *Martin v. Hewitt*, above referred to, is made to rest. But where the decree has been executed, and persons not parties to the proceedings in the court of probate have acquired interests upon which they would be entitled to be heard, then the jurisdiction of the court of probate would fail to afford the necessary relief, without the exercise of chancery powers. Such powers have not been bestowed by law upon the courts of probate. Then, the decrees of the rebel courts of probate must either be held to be nullities, which the decision in *Martin v. Hewitt* will not permit, or their errors must go uncorrected, which in many cases would be a great hardship upon minors and persons out of the jurisdiction of the rebel authority. To avoid this injustice, and at the same time to afford relief to parties really interested in the matters in controversy in the proceeding, with whom a court of probate can not deal, I have no doubt that it is a legitimate application of principles long established in our system, to allow a resort to chancery for relief in such a case as that presented by the bill in this suit. I therefore think that the bill is not devoid of equity. And the objection mainly urged against it must be based upon the supposition that the decree of the rebel court of probate is a nullity, for in no other event would the remedy at law be complete. But this can not now be said, unless the so-called court of probate transcended the jurisdiction which it had usurped.

Admitting that the so-called "probate court of Mobile county" has received some recognition by the ordinance

above referred to, and the decision in the case of *Martin v. Hewitt, supra,* did that court transcend the jurisdiction it essayed to put in force by the order and decree of sale here complained of? If it did, then the whole proceeding is void, and incapable of any ratification by any department of the present government. For, a void judgment can no more be cured and made good, than a void law. A void decree is a nullity. And such a decree can not be cured by legislative enactment, because this would be the judgment of the general assembly, and not of a court. It is laid down by the text writers upon the most well considered authority, that " a void proceeding is so entirely vitiated as to be incapable of amendment." It can not be cured.—Macnamara on Nullities, p. 24, marg., and cases there cited ; 3 Chitt. Gen. Pr. p. 524, marg.; *Briggs v. Blue,* 5 McL. 148 ; *Kempe v. Kennedy,* 5 Cranch, 173. Here, the law under which the so-called " probate court of Mobile county" professed to act, was the Code of Alabama. This court was an " inferior court," and its jurisdiction was limited and special.—Const. Ala. 1819, Art. V, §§ 1, 9 ; Code of Ala. § 670 ; Rev. Code, § 790. The law in force at the time this sale was applied for and granted, was in the following words—that is to say :

" § 1754. Lands may be sold by the executor or administrator with the will annexed, for the payment of debts, in the following cases :

" 1. When the will gives no power to sell the same for that purpose, and the personal estate is insufficient therefor.

" 2. When a sale of the lands is more beneficial than a sale of slaves, and is not in conflict with the provisions of the will."—Code of Ala. § 1754 ; Rev. Code, § 2079.

Here are two grounds upon which the court may proceed to grant an order to sell the lands of a decedent in this State, for the payment of debts, and only two. These are set forth by number, by the legislative authority. Such an enumeration excludes all other grounds. And these grounds being each separately and distinctly stated, can not be combined. Either the one or the other must exist, else the court has no authority to act. The legisla-

tive intention to this effect is most clearly shown both by the language used to declare the jurisdictional facts, and their mode of statement. No other grounds save those mentioned in the statute need be set out in the petition for the order to sell. Such additional grounds are mere surplusage, and neither aid nor vitiate the proceeding. *Utile per inutile non vitiatur.*—7 Bouv. Bac. Abr. 460; 1 Pet. 18; 1 Ala. 326; 2 Saund. 306n. And both grounds might be alleged in the same petition, but one at least should be proven before the order to sell should be granted. And either would be sufficient, but not parts of both combined, because this would make a third ground not specified in the Code. Construction which sanctions such practice makes the law, rather than declares what it is. This is usurpation, and goes beyond the duty and power of the court. *Judicis est jus dicere non dare.*—Lofft. 42.

When a will is once lawfully established and admitted to probate in this State, it is required of all the courts, so far as they deal with it, to see that it is duly carried into effect; that the intention of the testator is executed, and not defeated. The will is the law when its provisions can be carried into operation, unless it conflicts with law. And it is only to be disregarded so far as such conflict exists.

In this case, the will gives no power to sell the testator's lands for the payment of her debts. But it directs a sale of a portion of the lands for re-investment for a particular purpose. Then, as the whole property of the decedent is charged with the payment of her debts, with certain exceptions which need not be here noticed, it might have been sold under the first clause of the section of the Code above qeoted.—Code of Ala. §§ 1737, 1738; *ib.* § 1754, cl. 1. But the petition was not based on this clause of the section; that is, that " a sale of the lands is more beneficial than a sale of slaves, and is not in conflict with the provisions of the will." Under this specification, two facts must concur to authorize the grant of the order for the sale : the beneficial character of the sale, and the non-conflict with the provisions of the will. Here, the petition alleges the necessary jurisdictional facts, in order to justify the court to undertake the inquiry proposed to be made. The

court, then, had rightful jurisdiction of the subject matter, so far as this can be given by the mere allegations of the petition.—*Satcher v. Satcher*, 41 Ala. 39; *Mattheson v. Hearin*, 29 Ala. 210. But the will itself is necessarily a limit upon the jurisdiction of the court. The statute so makes it. The duty of the court is to carry the provisions of the will into execution, and to see that the estate of the testator is disposed of as he directs in his testament. To do this, the court must look to the will as its guide. If the provisions of the will contradict the allegations of the petition, the jurisdiction of the court is suspended. It is forbidden to proceed, because the will is in the way. This the court must know, because the court is as much bound by the directions of the will as the administrator himself. The court, in dealing with the estate, necessarily does so under the limitations of the will. In such a case, then, the will must be regarded as a part of the petition for the order to sell, because the petition is founded upon the dispositions made in the testament itself.

Here the court had jurisdiction, but only upon a certain statement of facts. When the testamentary paper is looked to, it shows that these facts did not exist in connection with the facts alleged in the petition. The sale was, then, forbidden and unlawful. Such a sale is void when made under the order of an "inferior court."—*Mathewson v. Sprague*, 1 Ct. 457; *Ex parte Watkins*, 3 Pet. 193. If this construction is not to be adhered to, then the court of probate may utterly defeat the testator's disposition of his property, not by a mere irregularity in the proceeding, but by a disregard of the will and the law of its execution. This could not have been the legislative intent.

Again: the law in force at the date of this sale required that "the executor or administrator must, within sixty days after such sale, report on oath his proceedings to the court, who must examine the same, [the proceedings,] and may also examine witnesses in relation thereto." And on such examination such sale might be vacated, in whole or in part.—Code of Ala. §§ 1765, 1766. This legislative direction must have some force, else it may be altogether disregarded. If it is merely directory, its omission is but

an irregularity, which does not vitiate the proceeding.—
Macnamara on Nullities, p. 6, 24, marg. The death of the
administrator who made the sale, before it was properly
reported to the court, rendered it impossible for him to
make the report as required by law. The sale, until so re-
ported and confirmed, when it is for cash, is inchoate, and
it should be vacated by the court when the examination
authorized by the statute shows that the sale had been
made for a currency not allowed by law. Here, the bill
and the proofs show that the sale was for " treasury notes
of the Confederate States of America." Such a sale was
not authorized to be made for such a currency. And it
can not be sustained. It should have been set aside.—
Ordin. Conv. 1867, No. 40; Pamph. Acts 1868, p. 187.
And the learned chancellor erred in his refusal to vacate
said sale, and in the dismissal of appellant's bill in the
court below.

And the court of chancery having taken jurisdiction for
the purpose of vacating the sale, will proceed to settle
the whole controversy as equity may require.—*Blakey v.
Blakey*, 9 Ala. 391; *Gayle et al. v..Singleton*, 1 Stew. 566.
In this case, neither Forrer nor Tuthill can be treated as
*bona fide* purchasers without notice. One dealing with
lands so situated, must be charged with notice of the whole
proceedings upon which his title rests. These show that
the sale was unauthorized.—*Johnson v. Thweatt*, 18 Ala. 741.

In the further progress of this cause in the court below,
the said defendant, Forrer, will be charged with the value
of the use and occupation of the land in controversy
during the period of his possession, and he will be allowed
a credit for all necessary repairs and improvements by him
made on the same, and also a credit for the cash value of
the Confederate treasury notes paid by him for the same
under the authority of said so-called sale, if the same has
been of benefit to the testator or his heirs, said value to
be fixed at the date of the payment of said Confederate
treasury notes. And the said Tuthill will be charged with
the use and occupation of said land during his possession
of the same, and allowed credit for all necessary repairs

and improvements thereon by him made during his said possession.

The proceedings and proofs in the court below do not furnish sufficient grounds for a proper final decree in this court. The decree of the chancellor in the court below is therefore reversed, and the cause is remanded for further proceedings in the court below. The appellees will pay the costs of this appeal in this court and in the court below.

NOTE BY THE REPORTER.—The opinion in this case was delivered at the June term, 1871, but was inadvertently printed along with those of the January term, 1871. Owing to the importance of the principles involved, the Reporter has given the briefs at length, and set out the facts more in detail than usual.